709 S.E.2d 626

**MRI AT BELFAIR, LLC, and Hilton Head Regional Medical Center,**

v.

**SOUTH CAROLINA DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL and Southern MRI, LLC, Appellants, Respondents.**

No. 26962.

Supreme Court of South Carolina.

Heard Oct. 5, 2010.

Decided April 25, 2011.

M. Elizabeth Crum and Kelly M. Jolley, of McNair Law Firm, P.A., of Columbia, for Appellant MRI at Belfair, LLC.

Daniel J. Westbrook, Travis Dayhuff, and Holly G. Gillespie, of Nelson Mullins Riley & Scarborough, LLP, of Columbia, for Appellant Hilton Head Regional Medical Center.

Carlisle Roberts, Jr., Nancy S. Layman, Ashley C. Biggers, and Kristin L. Pawlowski, all of Columbia, for Respondent South Carolina Department of Health and Environmental Control.

E. Wade Mullins, III, of Bruner, Powell, Robbins, Wall & Mullins, LLC, of Columbia, for Respondent Southern MRI, LLC.

Justice KITTREDGE.

In this appeal, Appellants challenge a determination by the Department of Health and Environmental Control ("DHEC") that the total project cost of Respondent Southern MRI's purchase of magnetic resonance imaging equipment was less than $600,000. If the total project cost exceeded $600,000, Southern MRI should have applied to DHEC for a Certificate of Need ("CON"). If the total project cost did not exceed $600,000, Southern MRI did not need to apply for a CON. We reverse in part, vacate in part, and remand for further proceedings.

## I.

The State Certification of Need and Health Facility Licensure Act ("the CON Act") requires "[a] person or health care facility ... to obtain a Certificate of Need ... before undertaking any" of several types of projects enumerated in the Act. S.C.Code Ann. § 44–7–160 (2002 & Supp.2010). One type of project that requires a CON is "the acquisition of medical equipment which is to be used for diagnosis or treatment," if the total project cost for the acquisition exceeds $600,000. *Id.* § 44–7–160(6); 24A S.C.Code Ann. Regs. 61–15 § 102(1)(f) (1976 & Supp.2010).

When there is a question about whether a particular project exceeds the $600,000 threshold, the "potential applicant" must

request "a formal determination by the Department as to the applicability of the certificate of need requirements to [that] project." 24A S.C.Code Ann. Regs. 61–15 § 102(3). A formal determination that the total project cost does not exceed $600,000 is called a Non–Applicability Determination ("NAD").

Southern MRI requested a NAD for MRI equipment to be located at a new imaging center in Hilton Head, South Carolina. The imaging center would also include a host of other equipment, specifically a computed tomography ("CT") unit, two ultrasound machines,[1] a DEXA (which is used for measuring bone density), and an x-ray unit. These various forms of imaging equipment are referred to throughout the record, and this opinion, as "modalities."

DHEC treated each of these six modalities as a separate project for the purpose of the NAD request. However, because all six modalities would be located in a single building, they shared certain capital costs. For this reason, DHEC attributed a portion of each shared cost to each modality. Significantly, DHEC chose to allocate each modality an equal share. Using this allocation method, DHEC determined the total project cost for the MRI was less than $600,000. Thus, DHEC issued a NAD to Southern MRI, allowing Southern MRI to construct the imaging center and acquire the MRI.

Appellants MRI at Belfair and Hilton Head Regional Medical Center challenged the NAD in a contested case hearing before the Administrative Law Court ("ALC"), arguing the total project cost for the MRI exceeded $600,000.[2] The ALC upheld the NAD. The appeal was certified to this Court pursuant to Rule 204, SCACR.

On appeal, the parties present us with two main disputes. First, Appellants contend DHEC's method for allocating shared costs equally among the six modalities was improper.

1. Southern MRI later determined that it would not pursue a second ultrasound machine. Instead, it entered into a purchase agreement for a mammography unit.

2. After receiving its NAD, Southern MRI successfully moved to lift the automatic stay imposed by section 1–23–600 of the South Carolina Code during the pendency of the contested case. Southern MRI proceeded with construction, opened the imaging center, and began serving patients.

Second, Appellants contend DHEC undervalued the land and building leased by Southern MRI. Appellants contend that a proper calculation of the value of the property and a proper allocation of shared costs would result in a determination that the total project cost for the MRI exceeded $600,000.

## II.

On appeal from a final decision of the ALC in a contested case, we "may reverse or modify the decision if the substantive rights of the [Appellants] have been prejudiced because the finding, conclusion, or decision is: . . . (d) affected by [an] error of law; (e) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." S.C.Code Ann. § 1–23–610(B) (2005 & Supp.2010).

## III.

### A.   Allocation of Shared Costs

■   DHEC regulations define "total project cost" as:

[T]he estimated total capital cost of a project including land cost, construction, fixed and moveable equipment, architect's fee, financing cost, and other capital costs properly charged under generally accepted accounting princip[le]s as a capital cost. The determination of project costs involving leased equipment o[r] buildings will be calculated based on the total value (purchase price) of the equipment or building being leased.

24A S.C.Code Ann. Regs. 61–15 § 103(25). The six modalities in the imaging center shared several of the costs enumerated in this definition. For example, they shared common areas of the leased building, certain fixed and moveable equipment, and financing costs. Appellants argue it was improper for DHEC to allocate these shared costs equally among the modalities. We agree under the circumstances of this case.

The parties have focused much debate on whether DHEC was required to apply generally accepted accounting principles ("GAAP") when allocating shared costs. Each party contends application of GAAP can only lead to one result, and that

result is the one advocated by its expert. The competing opinions of the GAAP experts refute the premise of a single answer. GAAP are not a precise science. GAAP require the exercise of professional judgment and can lead to varying results. Here, the parties presented conflicting expert testimony with regard to whether DHEC's method of allocating shared costs was GAAP-compliant. Thus, given the inherent mix of objective and subjective considerations at play in a GAAP determination, application of GAAP is easier said than done. There is no bright-line application of GAAP in this case that easily answers the CON monetary threshold. Instead, we turn to "[t]he cardinal rule of statutory construction" that we must "ascertain and effectuate the legislative intent whenever possible." *Strother v. Lexington County Recreation Comm'n*, 332 S.C. 54, 62, 504 S.E.2d 117, 121 (1998).

The express purposes of the CON Act are "to promote cost containment, prevent unnecessary duplication of health care facilities and services, guide the establishment of health facilities and services which will best serve public needs, and ensure that high quality services are provided in health facilities in this State." S.C.Code Ann. § 44–7–120 (2002). The calculation of total project cost, then, is part of the mechanism by which the CON Act achieves its goal of cost containment. As such, DHEC must calculate total project cost in a manner that reflects the **true** cost of the project at issue. If a reasonable estimate of the cost of a project exceeds $600,000, it would be directly contrary to the purposes of the CON Act to allow that project to avoid CON review. *See id.* ("To achieve these purposes, this article requires: (1) the issuance of a Certificate of Need before undertaking a project prescribed by this article...."). The CON regulations require DHEC to use "[c]ommon practice and common sense" in determining whether a proposal presents a single expenditure for purposes of the $600,000 threshold, and further provide that "[a]n applicant should not be allowed to split what is really one expenditure into two or more for the purpose of avoiding review." 24A S.C.Code Ann. Regs. 61–15 § 102(2). Accordingly, DHEC must not allow a potential CON applicant to avoid the CON process based on an arbitrary factor. DHEC's method for allocating shared costs in this case had precisely that effect.

At the contested case hearing, DHEC witnesses explained that DHEC had recently changed its approach to allocating shared costs in imaging centers. Previously, DHEC's practice had been to calculate the total project cost using two alternative allocation methods, then use whichever figure was higher to make its Non–Applicability Determination. DHEC would (1) divide shared costs by the number of modalities and (2) allocate shared costs in proportion to the amount of clinical space dedicated to each modality. The latter method, referred to as the "relative square footage" method, is one of the allocation methods now advanced by Appellants.

When a new DHEC employee assumed responsibility for NAD requests, she proposed a change to DHEC's practice. This employee testified as follows:

[I]t made more sense to—to allocate as a percentage [of] clinical space with physician practices because often within physician practices there's only one modality. And that's certainly not their—their sole practice or—or their main function. Their main function is to see patients, and this is there as a service to their patients.

With an imaging center there's often more than one modality, and their main function is to provide imaging services. It made sense to me to prorate based on the amount of clinical space to physician's practices and to prorate based on the number of modalities with imaging centers.

On the suggestion of this employee, DHEC began allocating shared costs in imaging centers by dividing by the number of modalities. DHEC nevertheless continued to apply the relative square footage method advanced by Appellants to other entities, such as physicians' offices, that submitted NAD requests for the same equipment.

We find this distinction arbitrary because the differing purposes of imaging centers, physicians' offices and other facilities have no real impact on the cost of the equipment each might seek to acquire. Clearly, DHEC's policy shift and distinction in allocation method can have a profound impact on the total project cost. For example, using the relative square footage method, the MRI in this case would have been allocated 32.422 percent of each shared cost, rather than one-sixth

(16.667 percent) of each shared cost.[3] Moreover, the statutory and regulatory framework contemplates that imaging centers seeking to purchase the same equipment as other facilities must compete with those other facilities in the CON process. *See* 24A S.C.Code Ann. Regs. 61–15 § 307(2) ("In the case of competing applications, [DHEC] shall award a Certificate of Need, if appropriate, on the basis of which [application], if any, most fully complies with the requirements, goals, and purposes of the [CON] program, State Health Plan, project review criteria, and any regulations developed by [DHEC]."). Thus, DHEC's calculation of total project cost was affected by an arbitrary factor that strayed substantially from legislative intent and worked substantial prejudice to Southern MRI's competitors.

Given legislative intent, specifically the need for DHEC's calculation to reflect the practical reality of the proposal, it follows that the function of multiple modalities in a single facility can be relevant to the choice of an appropriate allocation method. For example, if the equipment sought to be purchased forms the main basis for the construction of the facility as a whole, then it might be reasonable in light of the purposes of the CON Act to charge that equipment with a greater portion of the overhead costs of the facility than might be charged to other, smaller projects within the same building. In this way, DHEC retains the flexibility to choose an allocation method that best suits the realities, and more accurately captures the true capital cost, of a project proposal. *Cf.* 24A S.C.Code Ann. Regs. 61–15 § 102(2) (requiring DHEC to apply "[c]ommon practice and common sense," to prevent applicants from splitting "what is really one expenditure into two or more for the purpose of avoiding review," and to avoid "lump[ing] projects together arbitrarily to bring them under review"). Where, as here, DHEC's chosen method has no basis in the facts of the proposal and arbitrarily allows a potential applicant to avoid the CON review process, it is

---

**3.** The ALC found the imaging center included 616.86 square feet of clinical space dedicated to the MRI and 1285.72 square feet of clinical space dedicated to the other imaging modalities. Thus, the MRI accounted for 32.422 percent of the total clinical space in the imaging center.

contrary to the purposes of the CON Act and therefore an error of law.

We note that by maintaining a rational fit between the allocation method and the proposal at issue, DHEC can avoid creating incentives for potential applicants to manipulate the NAD process and avoid CON review. If DHEC always divides shared costs by the number of modalities in an imaging center, an imaging center seeking to avoid CON review could purchase unnecessary but inexpensive equipment in order to drive down the total project cost of other, more expensive equipment. This danger is especially pronounced where, as here, the modalities at issue are different in every meaningful way. For example, DHEC acknowledged at oral argument that the MRI was significantly more expensive and required considerably more space than the other imaging modalities. The MRI was also expected to generate more patient traffic and more revenue than the other modalities. DHEC's current allocation method left such disparities in the investment in and importance of each modality unaccounted for, making the NAD process vulnerable to manipulation.[4]

In sum, DHEC's policy shift concerning imaging centers and its choice of allocation method in this case are manifestly at odds with legislative intent. Thus, the deference we normally accord an agency's policy determinations is not warranted. See *S.C. Coastal Conservation League v. S.C. Dep't of Health and Envtl. Control,* 363 S.C. 67, 75, 610 S.E.2d 482, 486 (2005) ("Courts defer to the relevant administrative agency's decisions with respect to its own regulations unless there is a compelling reason to differ."). Where modalities are truly similar, a division by modalities may be an appropriate method of capturing and allocating total project costs for CON purposes. Here, however, DHEC conceded that the MRI was the key financial producer and main expenditure for the proposed imaging center.[5] Treating the other lesser modalities equally

---

4. Other allocation methods could also invite manipulation. For example, a relative square footage method could be manipulated by placing inexpensive equipment in unnecessarily large rooms. The key to avoiding such gamesmanship is to look at the practical realities of the proposal.

5. At oral argument, DHEC referred to the six modalities as "one big thing and five little things." The "one big thing" was the MRI.

did not reflect the true cost of this project. DHEC's approval of an equal allocation of costs among manifestly unequal modalities resulted in an artificial reduction in total project cost. As a result, we find that DHEC erred as a matter of law. In so holding, we do not mandate any particular allocation formula, nor do we foreclose the possibility that DHEC might return to its previous practice of applying the highest figure obtained under any allocation method. Nevertheless, the method chosen by DHEC must provide a reasonable estimate of the true cost of the project at issue.

We turn now to Appellants' challenge to the appraised value of the property.

## B. Value of the Property

As defined by regulation, the total project cost for the MRI included the cost of leasing the building in which the imaging center was located, and this cost was to be calculated "based on the total value (purchase price) of the ... building being leased." 24A S.C.Code Ann. Regs. 61–15 § 103(25). Thus, Southern MRI provided DHEC with an appraisal by Gary Beaver, an appraiser licensed in South Carolina, valuing the property at $500,000. DHEC accepted this appraisal and attributed one-sixth of that cost to the MRI project. The ALC upheld this decision. Appellants contend the ALC erred in relying on the Beaver appraisal. We vacate this finding and place the property valuation issue before the ALC for a *de novo* determination.

At the contested case hearing, Appellants presented evidence that Beaver was disciplined by the Colorado Board of Real Estate Appraisers for failure to properly understand and employ recognized appraisal methods, and his license in Colorado was eventually revoked. More importantly for our purposes on appeal, Appellants presented evidence that several assumptions underlying the $500,000 appraisal in this case were inaccurate. For example, Appellants presented evidence—and the ALC found—that the building measured 5,083 square feet. Beaver's appraisal, however, stated the building was 5,016 square feet. As another example, Beaver made deductions from the appraised value of the building to account for the cost of mold remediation estimated at $30,000, but Appellants presented evidence that the actual cost of mold

remediation was only $1,200. Appellants offered an alternative value for the property of $775,000, based on their expert's appraisal. Southern MRI also offered an alternative value through Thomas Pietras, a certified public accountant and GAAP expert. Pietras valued the property at $634,500.

The ALC found Appellants "did not prove by a preponderance of the evidence that it was contrary to the applicable regulations to rely on Beaver's appraisal." However, the ALC acknowledged the Beaver appraisal was questionable, stating:

Applying GAAP to Beaver's appraisal may bring into question its reliability. In that event, the court is persuaded by Pietras's land valuation, which he determined by capitalizing the purchase option contained in the lease executed between Southern MRI and its landlord. The market value of the land and building would then be $634,500.

As discussed above, the total project cost must be a reasonable estimate of the true capital cost of the project at issue. Accordingly, to show that using Beaver's appraisal was "contrary to the applicable regulations," Appellants needed only show that Beaver's appraisal was unreasonable. To the extent the ALC's decision implies Appellants needed to make some additional showing, the decision was affected by an error of law. It appears to us that the ALC felt constrained to follow DHEC's acceptance of the Beaver appraisal; as the factfinder, the ALC was free to make factual findings based on its view of the credibility and weight of the evidence. The reasonableness of an appraisal is clearly an issue of fact, subject to the substantial evidence standard of review. Here, the ALC did not make a finding that Beaver's appraisal was reasonable and expressly found a higher value for the property "persuasive." We vacate and remand for a *de novo* determination of the value of the property.

## IV.

The express purposes of the CON Act, which include preventing unnecessarily duplicative facilities and services and containing costs, require DHEC to calculate total project cost in a manner that reflects the true cost of the project at issue. DHEC's method of allocating shared costs in this case—which was accepted by the ALC—permitted Southern MRI to re-

duce its total project cost based on a factor unrelated to the realities of its proposed imaging center. This was an error of law, and we reverse the portion of the ALC's order that relied on an equal division of shared costs. Moreover, the ALC failed to recognize that it would be contrary to the CON Act and its applicable regulations to rely on an appraisal that was not a reasonable estimate of the value of the property leased by Southern MRI. Thus, if the Beaver appraisal was unreasonable, it was error to rely on it. For this reason, we vacate the portion of the ALC's order that relied on the Beaver appraisal. We remand for further proceedings.

**REVERSED IN PART, VACATED IN PART, AND REMANDED.**

TOAL, C.J., PLEICONES, BEATTY and HEARN, JJ., concur.