804 S.E.2d 633

**DIRECTV, INC. & SUBSIDIARIES, Appellant,**

v.

**SOUTH CAROLINA DEPARTMENT OF REVENUE, Respondent.**

Appellate Case No. 2015-001509

**Opinion No. Op. 5513**

Court of Appeals of South Carolina.

Heard March 14, 2017

Filed August 30, 2017

Rehearing Denied January 11, 2018

60

John C. von Lehe, Jr. and Bryson M. Geer, both of Nelson Mullins Riley & Scarborough, LLP, of Charleston, for Appellant.

Nicole M. Wooten, William J. Condon, Jr., and Milton G. Kimpson, all of the South Carolina Department of Revenue, of Columbia, for Respondent.

WILLIAMS, J.:

In this appeal from the administrative law court (ALC), DIRECTV, Inc. & Subsidiaries (DIRECTV) argue the ALC erred in (1) applying an improper burden of proof, (2) holding DIRECTV's income-producing activities (IPA) consisted solely of signal delivery into its customers' homes, (3) finding DIRECTV failed to establish the portion of its IPA occurring in South Carolina, and (4) finding the South Carolina Department of Revenue (the DOR) properly imposed substantial understatement penalties. We affirm.

**FACTS/PROCEDURAL HISTORY**

This case involves the DOR's denial of DIRECTV's claims for refunds of South Carolina corporate income and license fee taxes for the tax years 2006 through 2008 and the assessment of South Carolina corporate income and license fee taxes,

interest, and penalties for the tax years 2009 through 2011. To properly determine DIRECTV's IPAs, we find it instructive to briefly detail DIRECTV's business operations and its methods for soliciting and securing customers and deriving its revenue.

**DIRECTV's Business Operations**

DIRECTV—a California corporation with its headquarters and principal place of business located in Los Angeles, California—provides access to direct-to-home digital television entertainment via satellite to residential and commercial customers across the United States in exchange for a subscription fee. DIRECTV has four principal "value drivers" for its business: development and acquisition of content; broadcast operations and distribution; marketing and sales; and customer care.

DIRECTV targets customers through high-quality, national advertisements designed to encourage existing and potential customers to call a toll-free number, which directs customers to DIRECTV's customer service call centers, to place an order for DIRECTV's television services. The call centers—located entirely outside of South Carolina and owned and operated by DIRECTV and third parties—facilitate the installation of set-top boxes and dishes in subscribers' homes and businesses by a third-party home service provider hired by DIRECTV.[1] DIRECTV delivers programming to a subscriber only after the subscriber signs a customer agreement and installation of DIRECTV's equipment is completed. For a monthly subscription fee, DIRECTV provides its subscribers access to original and acquired television programming.

DIRECTV produces several types of original programming and sporting events. Additionally, it acquires programming from third-party providers such as movie studios, broadcast television networks like NBC, local broadcast stations, and providers of cable programming like HBO and ESPN.[2] DIRECTV receives third-party programming content through

---

1. Customers are required to lease the set-top boxes from DIRECTV, and both parties agreed all income generated by South Carolina customers leasing the set-top boxes and purchasing tangible personal property, such as remote controls, should be included in the numerator of the gross receipts ratio.

2. DIRECTV's employees in California are responsible for the acquisition and negotiation of its third-party programming and for the development of its original programming.

satellite, fiber-optic cables, and over-the-air broadcasts. DI-RECTV's national broadcast centers in California and Colorado receive, process, collect, and transmit these signals to one of eleven satellites in geo-stationary orbit above the earth, which then sends a wide beam of energy covering the United States. Programming from local broadcast television stations is collected at unmanned, local collecting facilities maintained by DIRECTV and located throughout the country in correspondence with each of the 210 Nielsen assigned designated market areas.[3] Each of the local collecting facilities transmits signals to one of DIRECTV's six up-link facilities, located throughout the country but not in South Carolina. The up-link facilities transmit the content to one of the eleven geo-stationary satellites, which then transmits a narrow spot beam, containing only the local programming, to the designated market area from which it originated. DIRECTV's subscribers receive national and local programming from these signal beams via mounted satellite dishes on or near their homes or businesses. The signal then relays from the mounted satellite dishes to the subscribers' set-top boxes, which delivers the signal onto the subscribers' television sets.

Although DIRECTV established its four primary value drivers through testimony, DIRECTV primarily derives its revenue from "fees paid by its [approximately 20 million] customers for rentals of set-top boxes and subscriptions to its programming services." According to DIRECTV, this includes monthly fees from subscriptions to one or more video programming packages; revenue from pay-per-view programming; revenue from the sale or lease of DIRECTV's equipment; revenue from optional warranties on the leased set-top boxes; and revenue from fees associated with DVR set-top boxes, high-definition set-top boxes, and multiroom viewing charges. Other than DIRECTV's local collection facilities in South Carolina, its equipment rental and sale to subscribers in South Carolina, and the one or two employees located in South Carolina during the tax periods at issue, nearly all of DIRECTV's assets, employees, and property involved in providing its services to subscribers were located outside of South Carolina.

---

3. During the tax periods at issue, four local collection facilities were located in South Carolina.

### DIRECTV's Income Tax Returns

For income tax purposes, corporations like DIRECTV apportion net income to South Carolina using a fraction in which the numerator is gross receipts from within South Carolina during the taxable year and the denominator is gross total receipts from everywhere during the taxable year. *See* S.C. Code Ann. § 12-6-2290 (2014). For the 2006, 2007, and 2008 tax years, DIRECTV originally filed corporate income tax returns in South Carolina in which it sourced 100% of its subscription receipts and 100% of its rental receipts from South Carolina subscribers to the numerator of the gross receipts ratio. This corresponded to gross receipt ratios of 1.9539% for 2006; 2.0016% for 2007; and 2.0543% for 2008, which DIRECTV used to apportion its net income to South Carolina. In 2008, the DOR conducted a field audit on DIRECTV's tax returns from 2006 through 2008. Following the audit, the DOR did not make any adjustments to DIRECTV's tax returns, and thus, accepted DIRECTV's original 2006 through 2008 corporate tax income returns as filed. However, DIRECTV subsequently filed amended corporate income tax returns for tax years 2006 through 2008, wherein DIRECTV's only change was the removal of 100% of the South Carolina customer subscription receipts that was originally sourced to the numerator of the gross receipts ratio.

As a result, the gross receipts ratio used to apportion DIRECTV's net income to South Carolina changed from the original 1.9539% to an amended 0.0246% for 2006; from 2.0016% to an amended 0.0810% for 2007; and from 2.0543% to an amended 0.1137% for 2008. DIRECTV attached the following statement, explaining the change, to each of its three amended returns:

> The return is being amended to apportion sales receipts to the state under S.C. Code Ann. § 12-6-2295 which [sic] sources sales of services under a pro-rate cost of performance method. The originally filed return incorrectly apportioned satellite television subscription receipts to South Carolina using market-based sourcing, rather than the cost of performance sourcing that is prescribed by statute.[4]

---

4. In its amended order, the ALC noted both parties originally erred in referencing South Carolina's apportionment statute but later agreed

As a result of the change in the amended returns, DI-RECTV attempted to reduce its income tax and license fee liability by $5,976,810 and sought a refund in the same amount. The DOR conducted another field audit of DIRECTV, and in its November 29, 2011 field audit report, the DOR denied DIRECTV's amended returns and refund request and accepted DIRECTV's original 2006 through 2008 tax returns as filed. In its filed original corporate income tax returns for tax years 2009 through 2011, DIRECTV used a method for calculating the gross receipt ratio similar to the one in its amended 2006 through 2008 returns,[5] which resulted in gross receipts ratios of 0.1437% for the 2009 tax year; 0.1570% for the 2010 tax year; and 0.2962% for the 2011 tax year. Again, the DOR conducted an audit on these returns, and in its January 28, 2014 field audit report, the DOR assessed DI-RECTV for income taxes and license fees for 2009 through 2011 that calculated the gross receipts ratio by attributing 100% of DIRECTV's South Carolina subscription receipts to the numerator of the ratio.

## DOR Determination and ALC Hearing

On February 18, 2014, the DOR issued a department determination in which it found the gross receipts DIRECTV generated from the sale of subscriptions were directly produced from activity occurring within South Carolina, namely the delivery of the signal into South Carolina homes and businesses and onto customers' television sets. Accordingly, the DOR determined the revenue from DIRECTV's subscription receipts should be sourced to South Carolina. Thereafter, DIRECTV requested a contested case hearing of the DOR's determination before the ALC, seeking a determination of the

---

and clarified their positions to reflect "that South Carolina uses a method of apportionment based on the proportion of income-producing activity conducted within the State."

5. While DIRECTV did not include any South Carolina subscription receipts in the numerator of its gross receipts ratio in the amended 2006 through 2008 returns or on the original 2009 and 2010 returns, it did change its method slightly for the original 2011 returns by sourcing a percentage of its total subscription receipts to South Carolina based on a ratio of its South Carolina payroll to its total payroll, which ultimately resulted in approximately $22 million of its $410 million in South Carolina subscription receipts (approximately 5%) being included in the gross receipts ratio numerator.

extent to which DIRECTV's IPA occurred in South Carolina and whether the DOR properly assessed substantial understatement penalties against DIRECTV for taxes owed for the 2009 through 2011 tax years.

Following a hearing, the ALC issued an amended final order and decision on June 12, 2015. The ALC found (1) DIRECTV's IPA was the delivery of the signal into homes and businesses and onto the television sets of its customers; (2) the IPAs related to South Carolina customers occurred entirely within South Carolina; and (3) 100% of DIRECTV's subscription receipts from South Carolina customers must be sourced to the numerator of the gross receipts ratio. Additionally, the ALC found DIRECTV liable for substantial understatement penalties. Furthermore, the ALC denied DIRECTV's refund request for its amended 2006 through 2008 income tax returns and assessed DIRECTV $6,646,168 in tax and license fees; $653,425 in interest; and $1,246,155.75 in penalties relating to its 2009, 2010, and 2011 income tax returns. This appeal followed.

## ISSUES ON APPEAL

I. Did the ALC err in (1) holding DIRECTV's IPAs consist solely of the delivery of the signal into the homes of its customers and finding that DIRECTV failed to establish the portion of its IPAs that were conducted in South Carolina, and (2) applying an improper burden of proof?

II. Did the ALC err in finding the DOR properly imposed substantial underpayment penalties?

## STANDARD OF REVIEW

The Administrative Procedures Act (APA) governs appellate review of decisions from the ALC. *Risher v. S.C. Dep't of Health & Envtl. Control*, 393 S.C. 198, 203, 712 S.E.2d 428, 431 (2011).

The review of the [ALC]'s order must be confined to the record. The court may not substitute its judgment for the judgment of the [ALC] as to the weight of the evidence on questions of fact. The court of appeals may affirm the decision or remand the case for further proceedings; or[ ] it may reverse or modify the decision if the substantive rights

of the petitioner have been prejudiced because the finding, conclusion, or decision is:

 (a) in violation of constitutional or statutory provisions;

 (b) in excess of the statutory authority of the agency;

 (c) made upon unlawful procedure;

 (d) affected by other error of law;

 (e) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

 (f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

S.C. Code Ann. § 1-23-610(B) (Supp. 2016).

 ■ An appellate court should only reverse the ALC's order if it is unsupported by substantial evidence in the record or contains an error of law. *Original Blue Ribbon Taxi Corp. v. S.C. Dep't of Motor Vehicles*, 380 S.C. 600, 604, 670 S.E.2d 674, 676 (Ct. App. 2008); *see also Media Gen. Commc'ns, Inc. v. S.C. Dep't of Revenue*, 388 S.C. 138, 144, 694 S.E.2d 525, 528 (2010) ("A reviewing court may reverse the decision of the ALC [when] it is in violation of a statutory provision or it is affected by an error of law."). "Substantial evidence is not a mere scintilla of evidence nor evidence viewed blindly from one side, but is evidence [that], when considering the record as a whole, would allow reasonable minds to reach the conclusion that the agency reached. . . ." *Leventis v. S.C. Dep't of Health & Envtl. Control*, 340 S.C. 118, 130, 530 S.E.2d 643, 650 (Ct. App. 2000) (quoting *Welch Moving & Storage Co. v. Pub. Serv. Comm'n of S.C.*, 301 S.C. 259, 261, 391 S.E.2d 556, 557 (1990)). However, "[q]uestions of statutory interpretation are questions of law, which [the appellate court is] free to decide without any deference to the court below." *Centex Int'l, Inc. v. S.C. Dep't of Revenue*, 406 S.C. 132, 139, 750 S.E.2d 65, 69 (2013) (first alteration in original) (quoting *CFRE, LLC v. Greenville Cty. Assessor*, 395 S.C. 67, 74, 716 S.E.2d 877, 881 (2011)).

## LAW/ANALYSIS

### I. DIRECTV's IPAs and Burden of Proof

#### A. DIRECTV's IPA

DIRECTV asserts the ALC erred as a matter of law by misinterpreting sections 12-6-2290 and 12-6-2295(A)(5) of the

South Carolina Code. Further, DIRECTV argues the ALC erred in holding its IPA was the delivery of the signal into the homes and businesses of its customers and in finding DIRECTV failed to establish the portion of its IPAs that occurred in South Carolina because the ALC's findings are not supported by substantial evidence. We disagree.

"The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature." *Sloan v. Hardee*, 371 S.C. 495, 498, 640 S.E.2d 457, 459 (2007). "Whe[n] the statute's language is plain and unambiguous, and conveys a clear and definite meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning." *Media Gen. Commc'ns, Inc.*, 388 S.C. at 148, 694 S.E.2d at 530 (quoting *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000)). "Words must be given their plain and ordinary meaning without resort to subtle or forced construction to limit or expand the statute's operation." *Sloan*, 371 S.C. at 499, 640 S.E.2d at 459.

However, a court will reject the plain and ordinary meaning of the statute if the interpretation of the statute by its plain, ordinary meaning leads to an absurd result that was unintended by the legislature. *Duke Energy Corp. v. S.C. Dep't of Revenue*, 415 S.C. 351, 355, 782 S.E.2d 590, 592 (2016). "If possible, the court will construe the statute so as to escape the absurdity and carry the intention into effect." *Kiriakides v. United Artists Commc'ns, Inc.*, 312 S.C. 271, 275, 440 S.E.2d 364, 366 (1994). "In so doing, the [c]ourt should not concentrate on isolated phrases within the statute, but rather, read the statute as a whole and in a manner consonant and in harmony with its purpose." *Duke Energy Corp.*, 415 S.C. at 355, 782 S.E.2d at 592; *see also Etiwan Fertilizer Co. v. S.C. Tax Comm'n*, 217 S.C. 354, 360, 60 S.E.2d 682, 684 (1950) ("The prime object, of course, in the construction of a statute is to ascertain and give effect to the legislative intent.").

Corporate income tax in South Carolina "is imposed annually at the rate of five percent on the South Carolina taxable income of every corporation ... transacting, conducting, or doing business within this State or having income within this State, regardless of whether these activities are carried on in

intrastate, interstate, or foreign commerce." S.C. Code Ann. § 12-6-530 (2014). In South Carolina, a corporation's taxable income "is computed using the Internal Revenue Code with modifications as provided by South Carolina law, and this amount is 'subject to allocation and apportionment as provided in Article 17 of this chapter.'" *Media Gen. Commc'ns, Inc.*, 388 S.C. at 145, 694 S.E.2d at 528 (quoting S.C. Code Ann. § 12-6-580 (2014)). "If a taxpayer is transacting or conducting business partly within and partly without this State, the South Carolina income tax is imposed upon a base which reasonably represents the proportion of the trade or business carried on within this State." S.C. Code Ann. § 12-6-2210(B) (2014); *see also Lockwood Greene Eng'rs, Inc. v. S.C. Tax Comm'n*, 293 S.C. 447, 449, 361 S.E.2d 346, 347 (Ct. App. 1987) ("The purpose of the allocation statutes is to provide for imposition of South Carolina income tax 'upon a base which reasonably represents the proportion of the trade or business carried on within this State.'" (quoting *Hertz Corp. v. S.C. Tax Comm'n*, 246 S.C. 92, 95, 142 S.E.2d 445, 446 (1965))). Our supreme court has previously held that "the apportionment formula is a reasonable basis for establishing the income tax of corporations [that] ... do business on a multistate level." *Eastman Kodak Co. v. S.C. Tax Comm'n*, 308 S.C. 415, 419, 418 S.E.2d 542, 544 (1992).

In South Carolina, the nature of the taxpayer's business in the state determines the method of apportionment a taxpayer must use. For tax years prior to 2007,[6] the net income of a service provider such as DIRECTV[7] was apportioned "using a fraction in which the numerator is gross receipts from within this State during the taxable year and the denominator is total gross receipts from everywhere during the taxable year." S.C. Code Ann. § 12-6-2290 (1995) (amended Supp. 2007). For tax years following 2006, section 12-6-2290 of the South Carolina Code (2014) provides that "[f]or purposes of this section, items included in gross receipts are as provided in [s]ection 12-6-

---

6. In 2007, the General Assembly amended section 12-6-2290 by adding a sentence to the end of the existing statute, which included a cross reference to the new definition of "gross receipts" and took effect in the 2007 tax year. *See* Act No. 110, 2007 S.C. Acts 36–37.

7. The ALC identified DIRECTV as a service provider, and DIRECTV does not dispute this finding.

2295." The relevant subsection in the instant case is subsection 12-6-2295(A)(5), which states:

(A) The terms "sales" as used in [s]ection 12-6-2280 and "gross receipts" as used in [s]ection 12-6-2290 include, but are not limited to, the following items if they have not been separately allocated:

. . . .

(5) receipts from services if the entire income-producing activity is within this [s]tate. If the income-producing activity is performed partly within and partly without this [s]tate, sales are attributable to this [s]tate to the extent the income-producing activity is performed within this [s]tate.

S.C. Code Ann. § 12-6-2295 (2014).

In the instant case, DIRECTV argues the ALC committed an error of law because it misinterpreted section 12-6-2295(A)(5) when it looked to the location of DIRECTV's customers in determining DIRECTV's IPA. Because this argument concerns statutory interpretation, it is a question of law, which we may decide without any deference to the ALC. *See CFRE, LLC*, 395 S.C. at 74, 716 S.E.2d at 881. As used in section 12-6-2295(A)(5), the term "income-producing activity" helps define gross receipts as used in section 12-6-2290, which requires taxpayers like DIRECTV to apportion its corporate income to South Carolina using a fraction wherein the numerator is gross receipts from South Carolina during the taxable year and the denominator is gross receipts from everywhere during the taxable year. *See* S.C. Code Ann. § 12-6-2290 (2014). When examining the apportionment statutes, "the statutory policy is designed to apportion to South Carolina a fraction of the taxpayer's total income *reasonably attributable* to its business activity in this State." *Duke Energy Corp.*, 415 S.C. at 356, 782 S.E.2d at 592 (quoting *Emerson Elec. Co. v. S.C. Dep't of Revenue*, 395 S.C. 481, 485–86, 719 S.E.2d 650, 652 (2011)).

As applied, section 12-6-2295(A)(5) defines gross receipts as "receipts from services if the entire income-producing activity is within this [s]tate. If the income-producing activity is performed partly within and partly without this [s]tate, sales are attributable to this [s]tate to the extent the

income-producing activity is performed within this [s]tate." Giving the statutory language its plain and ordinary meaning, we find section 12-6-2295(A)(5) establishes that if a corporation generates revenue or income from activity performed exclusively within South Carolina, then its gross receipts must include that income in the numerator of the gross receipts ratio. However, if a corporation, acting on a multistate level, derives its revenue from activities occurring both inside and outside of South Carolina, then the revenue generated from its services performed within South Carolina are its gross receipts from South Carolina, and thus, must be included in the numerator of the gross receipts ratio. This interpretation keeps the legislative purpose of the allocation statutes intact. *See Lockwood Greene*, 293 S.C. at 449, 361 S.E.2d at 347.

Nevertheless, DIRECTV argues it presented substantial evidence at the ALC hearing to show how it generates income. DIRECTV's expert economist, Dr. Brian J. Cody, identified four primary value drivers—content development, marketing, broadcast operations, and customer service—that influence customers' decisions in subscribing to DIRECTV's services. Dr. Cody explained these drivers are DIRECTV's IPAs because DIRECTV engages in these activities to convert potential customers into subscribers and to create additional income from existing subscribers. Basing his formula on the methodology found in *Lockwood Greene*, Dr. Cody determined the percentage these IPAs occurred in South Carolina using a payroll and assets method, calculating DIRECTV's payroll and assets in South Carolina relative to their total payroll and assets everywhere else, as a proxy for approximating the amount of DIRECTV's total revenue occurring inside South Carolina.

In *Lockwood Greene*, the taxpayer—an engineering firm with offices, projects, and clients in numerous states, including South Carolina—sought a refund of income tax based on the argument that the then-apportionment statute required receipts to be apportioned based on where its customers were located and payments were made, which is an "origin of payment" view. 293 S.C. at 448, 361 S.E.2d at 347. The tax commission argued for a "place of activity" view, which apportions income based on the place where the services are performed. *Id.* The court of appeals noted that the taxpayer

provided services to its clients through highly trained engineers and personnel and that clients paid the taxpayer for the expertise and time of its employees. *Id.* at 449, 361 S.E.2d at 347. The court determined that the business of engineering firms, like the taxpayer, carried on in a state was reasonably measured by services rendered by its personnel in that state, which represented a "place of activity" test. *Id.* The court also noted that the taxpayer's argument regarding the tax commission's inconsistent interpretation of the statute based on the commission's guidelines was unpersuasive because the taxpayer did not operate a similar business to those businesses in which the tax commission focused on whether the services were performed in South Carolina. *Id.* at 450, 361 S.E.2d at 348.

DIRECTV asserts the "place of activity" test is still applicable, and thus, because the four primary value drivers representing its IPAs were accomplished through its employees, the payroll and assets method would reasonably represent "the proportion of gross receipts that should be sourced to South Carolina." [8] Moreover, DIRECTV argues the ALC—in finding that all of DIRECTV's activities, outside of beaming the satellite signals to its customers, were "preparatory" activities and were "too attenuated to the production of income" to be IPAs—misinterpreted and misapplied *Mercury Motor Express, Inc. v. South Carolina Tax Commission*, 244 S.C. 134, 135 S.E.2d 756 (1964).[9] DIRECTV argues the transactions

---

**8.** Dr. Cody's method resulted in an average of 0.85% of DIRECTV's gross subscriber receipts being sourced to South Carolina over the tax years at issue. Dr. Cody calculated the payroll formula by dividing DIRECTV's South Carolina-based payroll of two employees by its total payroll, which gave a weighted average of 0.07%. Dr. Cody then repeated this method by dividing the value of DIRECTV's South Carolina assets by its total assets, resulting in an average of 1.63% for the tax period at issue. Dr. Cody then averaged these two figures to obtain the 0.85% figure.

**9.** In *Mercury Motor*, the taxpayer, a multistate motor carrier, claimed the statutory apportionment formula improperly apportioned 17% of its income to South Carolina—representing 17% of its mileage in the state—when the taxpayer only generated approximately 1% of its gross revenue from delivery or picking up freight within South Carolina. 244 S.C. at 139, 135 S.E.2d at 758. Our supreme court stated the taxpayer was "engaged in income producing activity actually done and performed within" South Carolina, when the taxpayer's trucks traveled the

listed by the supreme court in *Mercury Motor* are analogous to DIRECTV's activities of content development, marketing, and broadcast operations in that both series of activities contribute to the generation of gross receipts, and ultimately, to net income to be apportioned.

■ Upon our review of the record, substantial evidence supports the ALC's finding that DIRECTV's IPA is the delivery of signal to its customers nationwide, and accordingly, the delivery of signal to South Carolina customers is represented by 100% of its South Carolina subscription receipts. Dr. Glen W. Harrison, the DOR's expert, determined the purchase of DIRECTV's services and the delivery of television services in the customers' homes or businesses was the activity that "actually generate[d] income" for DIRECTV. We also find DIRECTV's reliance on *Lockwood Greene* for the development of its proxy method is unfounded. While we acknowledge that the court in *Lockwood Greene* utilized a "place of activity" test based on the services provided by personnel in South Carolina, the facts are distinguishable from the instant case. *Lockwood Greene* involved an engineering firm that provided its clients a service from which it derived its income by offering the time and expertise of its highly trained engineers and personnel. 293 S.C. at 448, 361 S.E.2d at 347. Here, however, while DIRECTV has highly trained engineers and personnel obtaining content and producing innovative technology, DIRECTV's customers are paying DIRECTV for the end result of the personnel's work—the delivery of the signal that allows customers to enjoy the digital entertainment for which they pay DIRECTV. The service DIRECTV provides is entirely different from *Lockwood Greene* and DIRECTV's

---

state's highways. *Id.* at 141, 135 S.E.2d at 759. The court also listed a series of transactions—solicitation of freight, hauling of freight, picking up freight, delivering freight, and collecting charges—and stated each transaction in the series contributed to the earning and net income of the taxpayer, and "while each transaction is necessarily incidental to the production of its income, the transaction which primarily earns the income is the hauling of the freight." *Id.* The court found that the taxpayer failed to meet its burden of showing the tax was unconstitutional, arbitrary, and discriminatory because nothing indicated that its trucks, while traveling 17% of the roads, failed to contribute to the taxpayer's income or failed to earn less than 17% of the income. *Id.* at 141, 135 S.E.2d at 760.

source of income does not derive from its engineers, but rather from subscriptions to its programming packages.

Although we recognize that South Carolina law only requires a reasonable approximation for apportionment, we find Dr. Cody's method is not a reasonable approximation of DIRECTV's business activity in South Carolina. *See Covington Fabrics Corp. v. S.C. Tax Comm'n*, 264 S.C. 59, 66, 212 S.E.2d 574, 577 (1975). Dr. Cody designed his payroll and assets method to represent "the proportion of gross receipts that *should* be sourced to South Carolina," which would generate a hypothetical figure of South Carolina subscription receipts that would result from multiplying a payroll and assets percentage for a given year by DIRECTV's total subscription revenue for that year. (emphasis added). However, while DIRECTV asserts its IPA is its four primary value drivers and the payroll and assets method is a reasonable proxy for determining how much of its IPA should be apportioned to South Carolina, we find that 0.85% of DIRECTV's total subscription revenue does not reasonably represent DIRECTV's business activity in South Carolina. The payroll and assets method cannot be a reasonable approximation of the business activity conducted in South Carolina because DIRECTV's personnel in South Carolina during the periods at issue consisted of two employees, at most, and the only assets that DIRECTV owned in South Carolina were the four local collection facilities and the equipment purchased or leased by its subscribers. Additionally, we find Dr. Harrison correctly stated that the DOR appropriately sourced DIRECTV's subscription revenue from its South Carolina customers to the numerator of the gross receipts ratio because it directly represented DIRECTV's business activity in South Carolina and calculated DIRECTV's activity in the state. Furthermore, we agree with Dr. Harrison's statement that the proxies or approximations employed by DIRECTV were unnecessary in measuring the value of DIRECTV's services in South Carolina because the subscription fee paid by DIRECTV's subscribers directly placed a value on DIRECTV's services.

We note DIRECTV states its principal aim is to "package and deliver high quality video entertainment" to subscribers, and that it is not a media broadcaster, but "is a producer of original content and a multichannel video programming dis-

tributor, whose revenue is derived from fees paid by its customers for rentals of set-top boxes and subscriptions to its programming services." Stated differently, the service DI-RECTV provides to its approximately twenty million nation-wide customers is the delivery of high quality television enter-tainment. Its clients pay DIRECTV for the delivery of its television programming packages and for the equipment to process the signal DIRECTV sends to its customers. Thus, as a service provider, DIRECTV's IPA is the delivery of its programming signal to its customers across the country and in South Carolina.

In accordance with statutory language and policy, the fees paid by South Carolina subscribers for the lease and purchase of DIRECTV's equipment and the delivery of the signal to the subscribers represent the extent of the IPAs occurring in South Carolina; reasonably represent DIRECTV's business activity in South Carolina; and are to be included in the numerator of the gross receipts ratio as the South Carolina gross receipts for DIRECTV. *See* S.C. Code Ann. §§ 12-6-2290, -2295(A)(5); *see also Duke Energy Corp.*, 415 S.C. at 356, 782 S.E.2d at 592 ("[T]he statutory policy [for the apportion-ment statutes] is designed to apportion to South Carolina a fraction of the taxpayer's total income *reasonably attributable* to its business activity in this State." (quoting *Emerson Elec. Co.*, 395 S.C. at 485–86, 719 S.E.2d at 652)); *Eastman Kodak Co.*, 308 S.C. at 419, 418 S.E.2d at 544 ("The fact that a very small percentage of the leased assets are located in South Carolina is accounted for in the numerator of the apportion-ment formula in which Kodak's payroll, property, and sales in this state are computed. Therefore, the apportionment formula reflects a 'reasonable representation' of Kodak's business in this state."). Therefore, we agree with the ALC and find DIRECTV should source 100% of its South Carolina subscrib-er receipts to the numerator of the gross receipts ratio.

Last, we find DIRECTV's *Mercury Motor* argument unper-suasive. The "preparatory" activities that DIRECTV engages in for the production of its programming and marketing are not an IPA for the purposes of section 12-6-2295(A)(5). We note Dr. Cody testified these activities were conducted "in anticipation" of customers signing up for DIRECTV's services and DIRECTV engages in these activities "in anticipation of

future profits." Accordingly, these activities cannot be IPAs because they do not produce income, but rather, are "income-anticipatory" activities. DIRECTV's primary income-*producing* activity is the delivery of the signal to the customer because this activity actually generates income for DIRECTV. While the other activities occurring prior to the delivery of signal are important for DIRECTV in that it can help lead to income, section 12-6-2295(A)(5) requires activities that actually produce income. Thus, we agree with the ALC and find that these activities are "too attenuated" to be considered income-producing for the purposes of section 12-6-2295(A)(5).

In conclusion, we affirm the ALC because its decision is not affected by an error of law and is supported by substantial evidence. *See Media Gen. Commc'ns, Inc.*, 388 S.C. at 144, 694 S.E.2d at 528.

### B. Burden of Proof

DIRECTV next argues the ALC erred by applying an improper burden of proof because DIRECTV proved by a preponderance of the evidence it was entitled to a refund for tax years 2006 through 2008 and the DOR's assessment for the tax years 2009 through 2011 was incorrect. We disagree.

 The standard of proof in an administrative hearing of a contested case is by a preponderance of the evidence. *See* S.C. Code Ann. § 1-23-600(A)(5) (Supp. 2016) ("Unless otherwise provided by statute, the standard of proof in a contested case is by a preponderance of the evidence."). In general, the party asserting the affirmative issue in an adjudicatory administrative proceeding has the burden of proof. *See Leventis*, 340 S.C. at 132–33, 530 S.E.2d at 651. "In reaching a decision in a contested violation matter, the ALC serves as the sole finder of fact in the de novo contested case proceeding." *S.C. Dep't of Revenue v. Sandalwood Soc. Club*, 399 S.C. 267, 279, 731 S.E.2d 330, 337 (Ct. App. 2012) (emphasis omitted). "The Rules of Procedure for the Administrative Law Judge Division require that the AL[C] make independent findings of fact in contested case hearings, and the [APA] clearly contemplates that the AL[C] will make [its] own findings of fact in a contested case hearing." *Reliance Ins. Co. v. Smith*, 327 S.C. 528, 534, 489 S.E.2d 674, 677 (Ct. App. 1997) (citation omitted).

When conflicting evidence on an issue exists, the appellate court defers to the findings of the fact-finder in accordance with the substantial evidence standard of review. *Risher*, 393 S.C. at 210, 712 S.E.2d at 435.

In the instant case, the ALC determined DIRECTV had the burden of proof because it was challenging the DOR's determination that it must source its South Carolina subscription receipts from South Carolina customers to the numerator of the gross receipts ratio. Thus, the ALC required DIRECTV prove the DOR was incorrect for including DIRECTV's subscription receipts for its South Carolina customers in the numerator of the gross receipts ratio and that a refund of the 2006 through 2008 tax years and reassessment of 2009 through 2011 tax years was proper. However, the ALC determined DIRECTV failed to prove by a preponderance of the evidence that it was not required to source all of its subscription receipts from South Carolina customers to the numerator of the gross receipts ratio.

DIRECTV, on the other hand, relies on this court's findings in a property tax case—*Cloyd v. Mabry*, 295 S.C. 86, 367 S.E.2d 171 (Ct. App. 1988)—for support that it satisfied its burden of proof and is entitled to relief. In *Cloyd*, a county tax assessor assessed taxes on eight properties, which were located in a floodway and subject to strict restrictions on use following the enactment of an ordinance, without making an allowance for the ordinance's effect on the fair market value of the land. *Id.* at 87, 367 S.E.2d at 172. On appeal, the assessor claimed his assessment carried a presumption of correctness, which could not be set aside unless the landowners proved the actual value of their property. *Id.* at 88, 367 S.E.2d at 172–73. The court of appeals determined that a contesting taxpayer, who has the burden of proving the taxing authority's valuation incorrect, could overturn that presumption of correctness and be entitled to relief if the taxpayer either proved the actual value of the property or could show other evidence to indicate the assessing authority's valuation was incorrect. *Id.* at 88–89, 367 S.E.2d at 173.

DIRECTV asserts *Cloyd* is applicable here because it has been used in other tax cases unrelated to property tax. Furthermore, based on the findings in *Cloyd*, DIRECTV

contends it is entitled to appropriate relief because it satisfied its burden of proof by presenting detailed testimony and substantial evidence that showed the DOR's assessment was incorrect and because the DOR did not present credible evidence as to DIRECTV's IPA.

We find DIRECTV's reliance on *Cloyd* is misguided. While it has been used as the burden of proof in personal income tax, sales tax, and accommodation tax cases before the ALC, we note that none of these cases involved corporate income tax, or more importantly, the apportionment of corporate income. Thus, because the facts of *Cloyd* are too far removed from the facts of the instant case, the application of the *Cloyd* burden of proof is inapplicable here. Furthermore, even if we applied *Cloyd*, we find DIRECTV failed to satisfy its burden of proof because it did not demonstrate an actual value for its IPAs and did not present other evidence proving the DOR incorrectly included 100% of DIRECTV's subscription receipts from South Carolina customers in the numerator of the gross receipts ratio.

As the fact-finder, the ALC was free to weigh evidence and determine witness credibility in making its factual findings. *See MRI at Belfair, LLC v. S.C. Dep't of Health & Envtl. Control*, 392 S.C. 314, 324, 709 S.E.2d 626, 631 (2011). Both parties presented their own experts in economics and tax policy to convey their opinions on where DIRECTV's IPA occurred. In light of the evidence presented, the ALC found DIRECTV's argument unpersuasive. In particular, the ALC found Dr. Cody's methods did not provide actual values for DIRECTV's services and his proxies did not provide a reasonably approximate value of DIRECTV's IPAs in South Carolina. As previously mentioned, we agree with the ALC's assessment that DIRECTV's payroll and assets proxy is not a reasonable approximation of its IPA in South Carolina. Moreover, because the DOR presented evidence that conflicted with DIRECTV's evidence regarding the sourcing of the IPA, our substantial evidence standard of review dictates that we defer to the findings of the fact-finder. *See Risher*, 393 S.C. at 210, 712 S.E.2d at 435. Accordingly, the ALC properly determined DIRECTV did not satisfy its burden based on the ALC's findings that "rental and sales receipts received from South

Carolina customers are properly included in the numerator of the gross receipts ratio."

Additionally, DIRECTV argues the ALC ignored the substantial factual and economic evidence it presented. DIRECTV points out the ALC held that "the delivery of the signal into the homes and onto the television sets of DIRECTV's customers" was DIRECTV's IPA despite stating that it did not adopt the DOR's view that IPA of "businesses within the direct broadcast services industry is completely limited to the delivery of a signal into the customer's home and onto the customer's television."

We find, however, that simply because the ALC did not agree with the DOR's apportionment method does not mean DIRECTV satisfied its burden of proof. DIRECTV was still required to prove that removing South Carolina subscription receipts from the numerator reasonably represented its business activity in South Carolina. *See Lockwood Greene*, 293 S.C. at 449, 361 S.E.2d at 347. Furthermore, we agree with the ALC that the outcome of the DOR's assessment—including 100% of South Carolina subscription receipts in the numerator of the gross receipts ratio—is correct, but like the ALC, we find this is not DIRECTV's sole IPA in South Carolina. Nevertheless, while other IPAs may have occurred within the state, sourcing 100% of DIRECTV's subscriptions to the numerator of the gross receipts ratio best represents DIRECTV's activity within South Carolina.

Mindful of our standard of review and in light of the evidence presented in the record, we affirm the ALC because its findings were not "clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record." S.C. Code Ann. § 1-23-610(B)(e) (Supp. 2016). Thus, we find DIRECTV failed to meet its burden of proof and show why its South Carolina subscription receipts should not be sourced to the numerator of the gross receipts ratio.

## II. Substantial Underpayment Penalties

Last, DIRECTV argues substantial evidence does not support the ALC's finding that the DOR properly imposed substantial understatement penalties. We disagree. Section 12-54-43(A) of the South Carolina Code (2014) applies civil penalties

to every South Carolina tax law that requires a return unless otherwise provided. Section 12-54-155(A)(1) of the South Carolina Code (2014) addresses substantial underpayments of taxes and provides that "[i]f there is an underpayment attributable to . . . a substantial understatement of tax for a taxable period . . ., there must be added to the tax an amount equal to twenty-five percent of the amount of the underpayment." "[T]here is a substantial understatement of tax for a taxable period if the amount of the understatement for the taxable period exceeds the greater of ten percent of the tax required to be shown on the return for the taxable period or five thousand dollars." S.C. Code Ann. § 12-54-155(B)(1)(a) (2014). As applied, the term "understatement" means "the excess of the amount of the tax required to be shown on the return for the taxable period over the amount of the tax imposed which is shown on the return." S.C. Code Ann. § 12-54-155(B)(2)(a) (2014).

> The amount of the understatement . . . must be reduced by that portion of the understatement which is attributable to the tax treatment of an item: (i) by the taxpayer if there is or was substantial authority for that treatment, or (ii) with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return and there is a reasonable basis for the tax treatment of the item by the taxpayer.

S.C. Code Ann. § 12-54-155(B)(2)(b). The statute further adds that "[a] penalty must not be imposed pursuant to this section with respect to a portion of an underpayment if it is shown that there was a reasonable cause for the portion and that the taxpayer acted in good faith with respect to the portion." S.C. Code Ann. § 12-54-155(D)(1) (2014).

 The ALC found the DOR was correct in its understatement and interest calculations for the 2009 through 2011 tax years. It also found no substantial authority supported DIRECTV's treatment of its subscription receipts and DIRECTV's basis for its tax treatment of the subscription receipts was unreasonable. However, the ALC reduced the understatement penalty to 25% of the original penalty because DIRECTV acted with sufficient belief in bringing its claim regarding the portion of the understated tax amounts.

DIRECTV, however, asserts it presented substantial evidence and testimony demonstrating its treatment of subscription revenue was correct. DIRECTV also asserts it had substantial authority for its treatment of the subscription revenue based on the holdings in *Lockwood Greene* and *Mercury Motor*. Finally, DIRECTV claims it demonstrated good faith by attributing a portion of its subscription revenue to South Carolina for the 2011 tax year. We affirm the ALC's decision to assess underpayment penalties.

As previously discussed, the record contains substantial evidence demonstrating DIRECTV's use of the payroll and assets method was an unreasonable approximation of its IPA in South Carolina and did not reasonably represent DIRECTV's business activity in the state. *See Duke Energy Corp.*, 415 S.C. at 356, 782 S.E.2d at 592 ("[T]he statutory policy [for the apportionment statutes] is designed to apportion to South Carolina a fraction of the taxpayer's total income *reasonably attributable* to its business activity in this State." (quoting *Emerson Elec. Co.*, 395 S.C. at 485–86, 719 S.E.2d at 652)); *Covington Fabrics Corp.*, 264 S.C. at 66, 212 S.E.2d at 577 (explaining only a reasonable approximation is necessary for apportionment purposes). Moreover, DIRECTV's original tax returns filed for the 2006 through 2008 tax years sourced all of its subscription receipts in South Carolina to the numerator of the gross receipts ratio, but only after filing amended returns did DIRECTV rely on the holdings of *Lockwood Greene* and *Mercury Motor*, both of which were settled law by 2006. DIRECTV's reliance on these cases is unfounded because—regardless of their holding—established law dictates the purpose of the apportionment statutes is to apportion corporate income upon a basis that reasonably represents the corporation's business activity in South Carolina. *See* S.C. Code Ann. § 12-6-2210(B); *Duke Energy Corp.*, 415 S.C. at 356, 782 S.E.2d at 592; *Lockwood Greene*, 293 S.C. at 449, 361 S.E.2d at 347. Because DIRECTV's treatment of its income tax did not reasonably represent its business activity in the state, DIRECTV could not have relied on substantial authority for its treatment of the subscription receipts.

Finally, subsection 12-54-155(D)(1) requires the taxpayer to both act in good faith and have a reasonable cause for the portion of an underpayment before the removal of the penalty.

In the instant case, the ALC reduced DIRECTV's penalty to 25% of the original amount because DIRECTV "acted with sufficient belief in bringing its claim regarding the portion of the understated tax amounts." While the ALC found DIRECTV acted in good faith, the ALC did not, however, find a reasonable cause for DIRECTV's underpayment. Therefore, in accordance with our standard of review, we affirm the ALC's amended order regarding substantial understatement penalties.

## CONCLUSION

Based on the foregoing, we find the ALC did not err by finding DIRECTV's IPA was the delivery of its signal into the homes and businesses of its customers and DIRECTV must source 100% of its subscription receipts from South Carolina customers to the numerator of the gross receipts ratio. We likewise affirm the ALC's assessment of underpayment penalties. Accordingly, the ALC's decision is

**AFFIRMED.**

KONDUROS, J., and LEE, A.J., concur.