## THE STATE OF SOUTH CAROLINA
### In The Court of Appeals

Tractor Supply Company, Appellant,

v.

South Carolina Department of Revenue, Respondent.

Appellate Case No. 2024-000013

———

Appeal From The Administrative Law Court
Ralph King Anderson, III, Administrative Law Judge

———

Opinion No. 6148
Heard September 9, 2025 – Filed June 17, 2026

———

**AFFIRMED**

———

John C. Von Lehe, Jr., Bryson Moore Geer, Robert T.
Streisel, all of Nelson Mullins Riley & Scarborough,
LLP, of Charleston, and C. Mitchell Brown, of Nelson
Mullins Riley & Scarborough, LLP, of Columbia, all for
Appellant.

Marcus Dawson Antley, III, Wayne Allen Myrick, Jr.,
and Jason Phillip Luther, all of Columbia, for
Respondent.

———

**CURTIS, J.:**  In this corporate tax case, Tractor Supply Company (TSC) protests
the South Carolina Department of Revenue's (Department) assessment of its
corporate income taxes for the calendar years 2014, 2015, and 2016 (the audit
period).  TSC argues the Administrative Law Court (ALC) erred in affirming the

Department's requirement that TSC use "combined unitary reporting" to determine its South Carolina income tax obligation.  We affirm.

**BACKGROUND**

In this state, "[a]n income tax is imposed annually at the rate of five percent on the South Carolina taxable income of every corporation . . . transacting, conducting, or doing business within this State or having income within this State, regardless of whether these activities are carried on in intrastate, interstate, or foreign commerce."  S.C. Code Ann. § 12-6-530 (2014).  A corporation's taxable income in South Carolina is computed using the Internal Revenue Code with modifications as provided by Article Nine of the South Carolina Income Tax Act.  S.C. Code Ann. § 12-6-580 (2014).  The modified amount is "subject to allocation and apportionment as provided in Article 17 . . . ."  *Id*.  "If a taxpayer is transacting or conducting business partly within and partly without this State, the South Carolina income tax is imposed upon a base which reasonably represents the proportion of the trade or business carried on within this State."  S.C. Code Ann. § 12-6-2210(B) (2014).

States have historically taken varied approaches for assessing the corporate tax base for multi-state corporations.  In 1957, in an effort to promote uniformity among the states and their tax reporting methods, the National Conference of Commissioners on Uniform State Laws drafted the Uniform Division of Income for Tax Purposes Act (UDITPA).  James S. Helms & Geoffrey J. Christian, *The Evolution of UDITPA Section 18's Applicability and Distortion Standard*, 38 J. Corp. Tax'n 3 (2011).  While South Carolina has not adopted UDITPA wholesale, the General Assembly enacted a statutory scheme nearly identical to UDITPA's allocation and apportionment of income provisions in 1995.  *See* S.C. Code Ann. § 12-6-2320 (2014) (the apportionment statute).

"Article 17, entitled 'Allocation and Apportionment' provides certain income that is not related to business activity in South Carolina must be directly allocated to a taxpayer and is not subject to apportionment."  *Media Gen. Commc'ns, Inc. v. S.C. Dep't of Rev.*, 388 S.C. 138, 145, 694 S.E.2d 525, 528 (2010).  "All income remaining after allocation . . . is apportioned in accordance with Section 12-6-2252 [the general apportionment statute], or one of the special apportionment formulas. . . . "  S.C. Code Ann. § 12-6-2240 (2014).  Manufacturers and those selling tangible personal property, like TSC, must use the sales factor.  S.C. Code Ann. § 12-6-2252(A) (2014).  "The sales factor is a fraction in which the numerator is the total sales of the taxpayer in this State during the taxable year and

the denominator is the total sales of the taxpayer everywhere during the taxable year."  S.C. Code Ann. § 12-6-2280(A) (2014).

Apportionment is not an exact science; it only requires a "reasonable approximation" of the taxpayer's South Carolina business activity.  *DIRECTV, Inc. v. S.C. Dep't of Revenue*, 421 S.C. 59, 76, 804 S.E.2d 633, 642 (Ct. App. 2017).  The apportionment statute allows the Department to require use of a reasonable alternative method of allocation and apportionment when the standard provisions in the Code "do not fairly represent the taxpayer's business activity in this State."  S.C. Code Ann. § 12-6-2320(A) (2014).

South Carolina is a separate entity reporting state, meaning that each corporate entity transacting business within the state must file a separate tax return that includes only the income of the individual entity.  S.C. Code Ann. § 12-6-4910(2) (2014).  By contrast, some states require the filing of a consolidated return that treats a group of multiple corporations who are part of a unified business as a single company by combining the income and expenses of parent and subsidiary corporations in one return.

Consolidated or combined unitary reporting (CUR), "is based on the principle that a group of corporations is taxed on their consolidated taxable income, 'representing principally the results of its dealings with the outside world after the elimination of intercompany profit and loss.'"  *Leathers v. Jacuzzi, Inc.*, 935 S.W.2d 252, 254 (Ark. 1996) (quoting 3 Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates, and Gifts* ¶ 90.5 at 90 (2d ed. 1988)).  A unitary corporate group is "a business in which there is a high degree of interrelationship and interdependence among related entities so that the value of the business as a whole exceeds the sum of its individual elements." *Media General*, 338 S.C. at 141, 694 S.E.2d at 526.  These groups will often "share a unity of management, ownership, and control of operations resulting in unquantifiable flows of value among the related entities of the business."  *Id*.  While single entity reporting treats each entity in an affiliated group as separate taxpayers, CUR considers the income of all of the entities in the group, even those who do not directly do business in the state.  Under CUR, the numerator of the sales factor represents the *group's* gross sales within South Carolina, and the denominator represents the *group's* gross "everywhere" sales.  *Id.* at 146, 694 S.E.2d at 529.

TSC derives 99% of its revenue from its retail operations.  In 2001, TSC restructured, at least partly for the purpose of reducing its state tax burden.  TSC created two affiliated subsidiaries: Tractor Supply Company of Michigan, LLC

(TSC Michigan), and Tractor Supply Company of Texas, LP (TSC Texas). TSC Michigan is 100% owned by TSC; TSC Texas is 99% owned by TSC Michigan and 1% owned by TSC. Because South Carolina is a "separate entity" state, only TSC is a South Carolina taxpayer.

TSC was audited by the Department in 2006 and again in 2010. As a result of the 2010 audit, the Department instructed TSC to file a combined unitary return with TSC Texas and TSC Michigan. TSC filed a combined unitary return for the tax year 2012, but the following year it reverted to separate entity reporting.

The Department audited TSC again in 2018. As a result, it issued a Department Determination on November 12, 2019, finding TSC operated within a unitary group and concluding that (1) TSC's use of separate entity reporting and the standard apportionment formula did not fairly represent the extent of its business activity in South Carolina, and (2) the Department's application of CUR was a reasonable alternative apportionment method pursuant to section 12-6-2320(A)(4). As a result, TSC owed additional taxes of $1,383,064 plus interest for the audit period. TSC responded by filing a request for a contested case hearing with the ALC, arguing that the Department was unable to meet its burden of proving the standard apportionment formula did not fairly represent its South Carolina activities.[1]

After a hearing on the merits, the ALC issued a Final Amended Order in favor of the Department. In its order, the ALC found the Department proved that TSC's business activity was not fairly represented by utilizing the standard apportionment formula with separate reporting because evidence showed the TSC group operated as a unitary business that used its business structure to dilute TSC's South Carolina income and business activity through the use of inflated transfer pricing between the TSC entities. The ALC rejected TSC's "narrow interpretation" of section 12-6-2320, which would require TSC to adjust the transfer price at issue rather than utilize CUR. The ALC also held that the Department had met its burden to

---

[1] The TSC group filed a consolidated federal income tax return during the audit period, which identified TSC, TSC Texas, and TSC Michigan as a unitary group. TSC filed a consolidated federal return because all the entities are owned 100% directly or indirectly by TSC. All the intercompany transactions are eliminated on the federal consolidated return because an expense for one member of the TSC group is canceled out by corresponding income from another member of the group. TSC is the only member of the unitary group that files taxes in South Carolina because that entity owns all of the Tractor Supply retail stores in South Carolina.

establish CUR as a "reasonable and equitable" alternative that "reasonably carves out and fairly represents the income associated with TSC's business activity . . . ." Finally, the ALC rejected the argument that the Department violated the Administrative Procedures Act by "using Revenue Ruling 15-5 to systematically target unitary businesses for combined unitary reporting" without the proper factual determinations. This appeal followed.

**STANDARD OF REVIEW**

In an appeal from an ALC decision, the appellate court may only reverse if the decision is

> (a) in violation of constitutional or statutory provisions; (b) in excess of the statutory authority of the agency; (c) made upon unlawful procedure; (d) affected by other error of law; (e) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." S.C. Code Ann. § 1-23-610(B) (Supp. 2025). To determine if the ALC's decision was supported by substantial evidence, the court must determine whether there is evidence in the record from which reasonable minds could reach the same conclusion as the ALC.

*Hill v. S.C. Dep't of Health & Env't Control*, 389 S.C. 1, 9–10, 698 S.E.2d 612, 617 (2010).

The court "may not substitute its judgment for the judgment of the [ALC] as to the weight of the evidence on questions of fact." *Rent-A-Ctr. E., Inc. v. S.C. Dep't of Revenue*, 425 S.C. 582, 586, 824 S.E.2d 217, 219 (Ct. App. 2019) (alteration in original). However, the interpretation of a statute is a question of law that an appellate court may decide de novo. *CFRE, LLC v. Greenville Cnty. Assessor*, 395 S.C. 67, 74, 716 S.E.2d 877, 881 (2011). "[I]n the enforcement of tax statutes, the taxpayer should receive the benefit in cases of doubt." *Alltel Commc'ns, Inc. v. S.C. Dep't of Revenue*, 399 S.C. 313, 321, 731 S.E.2d 869, 873 (2012) (quoting *S.C. Nat'l Bank v. S.C. Tax Comm'n*, 297 S.C. 279, 281, 376 S.E.2d 512, 513 (1989)).

**LAW/ANALYSIS**

**I.      Did the ALC err in finding that the standard sales factor method of apportionment did not fairly represent TSC's business activity within the state?**

The apportionment statute provides "[i]f the allocation and apportionment provisions of this chapter do not fairly represent the extent of the taxpayer's business activity in this State . . . then the taxpayer may petition for, or the [D]epartment may require, in respect to all or any part of the taxpayer's business activity, if reasonable . . . the employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income."  S.C. Code Ann. § 12-6-2320(A).  TSC argues the ALC employed the wrong standard in making this determination by considering whether separate reporting resulted in distortion of TSC's business activity rather than focusing solely on whether the sales factor resulted in distortion.  We disagree.

When a party seeks to deviate from the standard apportionment formula, "the proponent of the alternate formula bears the burden of proving by a preponderance of the evidence that: (1) the statutory formula does not fairly represent the taxpayer's business activity in South Carolina and (2) its alternative accounting method is reasonable."  *Carmax Auto Superstores W. Coast, Inc. v. S.C. Dep't of Revenue*, 411 S.C. 79, 89, 767 S.E.2d 195, 200 (2014).

Our supreme court has held that the Department cannot justify deviation from the standard formula merely by showing that the standard apportionment formula results in a lower tax burden or that it is part of an overall tax minimization strategy.  In *Carmax*, the taxpayer used the "gross receipts" standard apportionment method.  *Id*. at 83–84, 767 S.E.2d at 197.  This method was rejected by the Department, as the Department sought to prevent CarMax from diluting its income by inflating the denominator of its apportionment ratio with retail sales from its western affiliate's retail operations.  *Id*.  The Department also sought to include the income from the sale of securitized consumer lending contracts in CarMax's South Carolina income.  *Id*. at 84, 767 S.E.2d at 197.  The ALC affirmed the Department's use of the alternate formula and CarMax appealed, arguing that the Department should not have used separate reporting when calculating the tax liability of its unitary business.  *Id*.  This court reversed and remanded the case to the ALC for application of the proper burden of proof.  *Id*. at 85, 767 S.E.2d at 197.

The South Carolina Supreme Court granted certiorari and found the Department failed to satisfy its burden of proving that the standard "gross receipts" formula distorted CarMax's income. *Id.* at 90, 767 S.E.2d at 200. The ALC relied solely on testimony that CarMax's business strategy was "linked with tax minimization strategies" and that CarMax West's apportionment ratio yielded a significantly lower tax than that of CarMax East, indicating that CarMax West's income was diluted. *Id*. at 90, 767 S.E.2d at 201. The court held that even if true, that testimony "[did] not provide a sound evidentiary basis to support the conclusion that the statutory formula did not fairly represent CarMax West's business in South Carolina." *Id*. at 91, 767 S.E.2d at 201.

Where only scant and conclusory evidence was presented by the Department in *CarMax*, here the Department presented substantial evidence supporting its use of an alternate formula. The Department argued—and the ALC affirmed—that TSC utilized intercompany transactions between itself and its subsidiaries to artificially shift TSC's South Carolina income to a sister company. Specifically, the Department argued TSC Texas artificially inflated the price it charged its sister companies for inventory procurement in order to shift income from retail sales to TSC Texas and avoid state income taxes, thereby making the sales formula an ineffective representation of TSC's business activity within the state.

As part of TSC's 2001 restructuring, all inventory procurement functions were transferred from TSC to TSC Texas. This transfer of function took place almost exclusively on paper. The same employees performed the inventory procurement function from TSC's corporate headquarters in Brentwood, Tennessee both before and after the restructuring. After restructuring, TSC Texas charged TSC and TSC Michigan a 9.7% markup on all inventory purchased from third party sellers. The 9.7% markup was based on a transfer pricing study performed by PricewaterhouseCoopers (PwC) that recommended a markup in the range of 3.9% to 12%.[2] As a result of this strategy, TSC saved approximately $13,000,000 in

---

[2] Transfer pricing is a mechanism by which companies assign prices to intercompany transactions. Because these transactions do not take place in an open market, they are susceptible to manipulation above the market rate to avoid higher tax rates. *See* Richard I. Simon, *Fair Representation in the South Carolina Corporate Income Tax: Combined Reporting as Equitable Apportionment after Media General Comm'ns, Inc. v. South Carolina Dep't of Rev.*, 62 S.C. L. Rev. 743, 766 (Summer 2011); *see also* 26 C.F.R. §§ 1.482-1 to 1.482-9 (2015) (setting forth methods and examples for determining whether transfer pricing meets the "arm's length" standard).

salary costs, but shifted approximately $300,000,000 in income from TSC to TSC Texas. TSC was therefore able to reduce its South Carolina corporate tax burden substantially by shifting this income to TSC Texas.

Both the Department and TSC presented expert testimony, and both experts agreed that the PwC pricing study was faulty. The Department's expert, Dr. David W. DeRamus, Ph.D., testified that the 9.7% markup that TSC Texas charged the other TSC entities for inventory procurement did not meet the arm's length standard and resulted in a distortion of TSC's income. In 2015, after the transfer pricing markup was employed, TSC's income dropped from $400-$500 million to $100 million per year, while TSC Texas's income shot up from $100 million per year to approximately $400 million per year. Furthermore, TSC saved only $13 million in employment costs for the inventory procurement employees when it shifted this expense to TSC Texas. After transfer pricing was implemented, TSC Texas accumulated, on average, about 71% of the TSC group's taxable income for the audit years, even though TSC had approximately 80% of the unified group's sales. Dr. DeRamus testified that in an arm's length setting, no company would forgo $300 million of income to save $13 million in salary costs, particularly for a function that is common to all retailers and does not involve any patents or specialized goods. He opined this would be an unsound business practice in the free marketplace. Dr. DeRamus stated that the idea of transferring a "vast disproportion of the profits" to another entity in exchange for providing a service that is a "small fraction of the broader headquarters' function" was "inconsistent with anything that [he'd] seen [in] third party transactions."

The ALC found Dr. DeRamus' testimony persuasive. While TSC's expert, Dr. David Andrade, testified to the contrary, the ALC specifically found his reasoning flawed and weighed the testimony accordingly. The ALC found that Dr. Andrade had not provided a sufficient basis for his determination that TSC and TSC Texas should split residual profits 50/50. The ALC further found the 9.7% markup on all of TSC's inventory was not an arm's length transfer price and the inflated markup was a method of shifting a large percentage of TSC's income from TSC to TSC Texas to avoid state income taxes. Thus, TSC's use of the standard sales factor did not fairly represent TSC's business activity within the state.

TSC argues the ALC erred in looking at these intercompany transactions and should have limited its analysis to whether the standard sales factor fraction was operating correctly. Instead, the ALC looked at whether TSC's income subject to apportionment was artificially low. TSC argues, "[i]f 10% of a taxpayer's business activity took place in South Carolina, the legislative intent is for an application of

the apportionment provisions to result in a fraction that is approximately 10%—that remains true regardless of what amount the taxpayer's income subject to apportionment *is or should be.*"  As the Department points out, TSC's narrow interpretation would allow a multistate taxpayer to artificially shift its income in any manner it chose and effectively eliminate its state tax burden without recourse. We find that adoption of TSC's reasoning would defeat the apportionment statute's stated purpose of fairly approximating the taxpayer's business activity in South Carolina.

Under this court's standard of review, we find Dr. DeRamus's testimony along with other testimony and evidence in the record provides substantial evidence to support the ALC's ruling that the standard apportionment formula did not fairly represent TSC's South Carolina business activity.

## II.     Did the ALC err in finding that CUR is authorized under the apportionment statute?

TSC argues the use of CUR violates the "clear and unambiguous language" of the apportionment statute as well as the legislative intent and is not a reasonable alternative to the standard sales factor formula.  We disagree and find the court's holding in *Media General* supports the ALC's decision that CUR is a permissible alternative formula.  We further find that there is substantial evidence in the record to support the ALC's determination that CUR is a reasonable alternative formula.

The ALC held it did not need to engage in statutory construction in this case because the South Carolina Supreme Court in *Media General* already determined that CUR is a permissible alternative formula.  Media General, Inc., was the parent company of a consolidated group of communications companies.  *Media General*, 388 S.C. at 141, 694 S.E.2d at 526.  The parent company owned all of the stock of Media General Communications, Inc. (MGC), which was a Delaware corporation. *Id.*  MGC in turn owned Media General Operations, a Delaware corporation which owned Media General Broadcasting of South Carolina Holdings, Inc., (MG Broadcasting) a Delaware corporation domiciled in Virginia.  *Id.*

The Department conducted a corporate tax audit of Media General, MGC, and MG Broadcasting, using the separate entity apportionment method, which "considers each entity having nexus with the taxing state as a separate and distinct entity, even if it is part of a unitary business."  *Id.* at 142, 694 S.E.2d at 527.  The corporations protested the Department's tax assessments and requested the Department use what it called "combined entity apportionment methodology" as an alternative method

pursuant to the provisions of the state's apportionment statute. *Id.* at 143, 694 S.E.2d at 527. The court described this method as:

> an accounting method whereby each member of a group carrying on a unitary business computes its individual taxable income attributable to activities in South Carolina by taking a portion of the combined net income of the group through the utilization of combined apportionment factors. The combined income of the unitary group is not computed for the purpose of taxing such income, but rather as a basis for determining the portion of income from the entire unitary business attributable to sources within South Carolina that is derived by members of the group subject to South Carolina's taxing jurisdiction. One of the purposes of this method is to capture the many subtle and largely unquantifiable transfers of value that take place among related companies of a single business enterprise.

*Id*. at 142, 694 S.E.2d at 527.

The Department in *Media General* agreed that the standard apportionment method it utilized in computing Media General's tax burden resulted in distortion and did not fairly represent the group's South Carolina business activity. *Id*. at 143, 694 S.E.2d at 527. The Department also agreed that the combined apportionment methodology fairly represented the corporations' South Carolina activities. *Id*. The Department declined to use combined apportionment, however, on the ground that it did not have the authority under the statute to use the combined apportionment method. *Id*. The ALC heard Media General's contested case and granted summary judgment in favor of Media General, finding the combined entity apportionment method appropriate and sanctioned by the apportionment statute. *Id*. at 143–44, 694 S.E.2d at 527.

The Department appealed, and our supreme court upheld the ALC's ruling. *Id*. at 140, 694 S.E.2d at 526. The court recognized the split of authority among states that have adopted a similar apportionment statute as to whether combined entity apportionment may be used as an alternative accounting method where the standard method does not fairly represent the taxpayer's business activity in the state. *Id*. at 144, 694 S.E.2d at 528. The court also recognized that prior South Carolina case law had rejected combined entity apportionment and had held that

"[s]ubsidiaries are treated as separate entities for tax purposes." *Id*. at 150, 694 S.E.2d at 531 (alteration in original) (quoting *NCR Corp. v. S.C. Tax Comm'n*, 312 S.C. 52, 56, 439 S.E.2d 254, 256 (1993)). However, despite South Carolina's long history as a separate entity reporting state, the court held that case law prior to the enactment of section 12-6-2320 was not controlling. *Id*. The court further found that the legislature "placed no explicit limitation on the alternative methods that may be used . . . ." *Id*. at 152, 694 S.E.2d at 532. Therefore, the court found the statute "clearly and specifically allow[ed] for the use of 'any other method'" when the standard apportionment formula resulted in distortion, stating, "[w]e agree with the ALC that the legislature enacted section 12-6-2320 as a relief mechanism, and hold that the plain language of subsection (A)(4) clearly authorizes the Department to use 'any other method' to effectuate an equitable apportionment of the taxpayer's income, including the combined entity apportionment method." *Id*. at 150–51, 694 S.E.2d at 531.

The *Media General* court relied on a similar case from the Oregon Supreme Court in *Coca Cola Co. v. Department of Revenue*, 533 P.2d 788 (Or. 1975). In that case, the Pacific Coca Cola Bottling Company was a wholly owned subsidiary of the Coca Cola Company. *Id*. at 789. Pacific operated in Oregon and Washington, while Coca Cola was a Delaware corporation with its principal office in Atlanta, Georgia. *Id*. Each filed a separate tax return. *Id*. at 790. The state of Oregon required multi-state businesses to use a statutory apportionment formula as set forth in UDITPA. *Id*. at 791. "The only exception existed where the apportionment method did not fairly represent the taxpayer's business activity within the state." *Id*. The use of any method other than the statutory apportionment method was considered "extraordinary" and the burden of proof was on the one seeking to use an alternate method. *Id*. The Oregon Department of Revenue found the two companies operated as one "vertically integrated business" and sought to use the "combined apportionment accounting method" to determine the group's tax liability. *Id*. at 790. The court in *Coca Cola* agreed that the two separate corporations functioned as a unitary group, and that the combined reporting method of apportionment was "wholly consistent with, and a natural extension of" the statutory formula. *Id*. at 793.

TSC seeks to distinguish the court's holding in *Media General* and points to the holding of the Indiana Tax Court in *Columbia Sportswear USA Corp. v. Indiana Department of State Revenue*, 45 N.E.3d 888 (Ind. T.C. 2015), as support for its argument that CUR is not an appropriate apportionment formula. TSC correctly points out that in *Media General*, the parties *agreed* that the standard formula did not fairly represent Media General's business activities in South Carolina and also

*agreed* that combined entity apportionment fairly represented the corporations' South Carolina activities.  388 S.C. at 146, 694 S.E.2d at 529.  TSC argues that because the parties there were in agreement as to the proper methodology, the case cannot be read as an endorsement of combined reporting by the court.  We disagree.[3]

First, in *Media General*, the Department made the same argument that TSC advances here —that "it was not authorized under South Carolina law to apply the combined entity apportionment method."  388 S.C. at 146, 694 S.E.2d at 529.  The court rejected this argument and held the "plain language" of the apportionment statute allowed for combined entity apportionment.  *Id.* at 151, 694 S.E.2d at 531.  Second, the ALC in *Media General* utilized a similar methodology that TSC claims the ALC incorrectly used in this case: the judge "compared the use of the separate entity apportionment method with the use of the combined entity apportionment method . . . ."  *Id*. at 146, 694 S.E.2d at 529.  The court described the combined method, stating that it "considers the entities that are part of the unitary business such that the numerator represents all of the unitary entities' gross receipts from within the taxing state and the denominator consists of all of the unitary entities' gross receipts from everywhere."  *Id.* [4]

---

[3] While not reflected in the opinion, during the pre-trial process "Media General provided various qualitative economic analyses, along with the percentage difference in apportionment methods, in reaching a conclusion with [the Department] regarding the existence of distortion [using the standard formula] and the equitable apportionment of its income under the proposed alternative method." Helms & Christian, *supra* at 10 n.39.  The statutory method in *Media General* resulted in a tax liability 435% greater than the alternative method proposed by the corporate taxpayer.  *Id.* at 10.

[4] TSC argues the "combined entity apportionment method" described in *Media General* is fundamentally different from CUR.  The Department contends that while the terminology is slightly different the principle is the same, and we agree. *See Media General*, 388 S.C. at 142, 694 S.E.2d at 527 ("The combined income of the unitary group . . . [is used] as a basis for determining the portion of income from the entire unitary business attributable to sources within South Carolina that is derived by members of the group subject to South Carolina's taxing jurisdiction . . . . to capture the many subtle and largely unquantifiable transfers of value that take place among related companies of a single business enterprise.")

TSC cites *Columbia Sportswear* for the proposition that CUR is not an authorized statutory apportionment method under UDITPA.  In *Columbia Sportswear*, the Indiana Department of State Revenue audited Columbia Sportswear, an Oregon corporation, and determined that intercompany transactions between its parent company and its affiliate, Mountain Hardware, Inc., had distorted Columbia's Indiana taxable income.  45 N.E.3d at 891.  The Department reached this conclusion by "merely alleg[ing] that the Standard Sourcing Rules must have distorted Columbia Sportswear's Indiana source income because of the 'big variance' between the percentages of gross profit for the consolidated group in comparison to Columbia Sportswear."  *Id*. at 898.  Upon finding distortion, the Department then used a complicated formula to recalculate Columbia Sportswear's tax base and applied the original apportionment percentage to the recalculated base.  *Id*. at 893.   The court found the Department's allegation of a "big variance" was not sufficient to justify the Department's use of an alternate formula.  *Id*. at 898.

At first blush, this case seems to be on all fours with the present case.  As in South Carolina, "[e]ach corporate taxpayer with Indiana adjusted gross income derived from sources within Indiana is required to report its [tax] liability on a separate company basis."  *Columbia Sportswear*, 45 N.E.3d at 892 (citing Ind. Code § 6-3-2-1(b) (2005) (amended 2011)).  Corporate taxpayers determine their Indiana tax base in the same manner as South Carolina, with almost identical provisions for the allocation and apportionment of income.  Like South Carolina, Indiana has not formally adopted UDITPA but has adopted nearly the same language as UDITPA Section 18, (the apportionment statute).  *Id.* at 894–95.

The Indiana Tax Court found the Department was prohibited from using an alternate apportionment method that re-computed the corporation's tax base, stating "the concepts of allocation and apportionment under [the AA statute] solely involve dividing the tax base among the states, not computing the tax base."  *Id.* at 895.  Further, the Tax Court found that the Department presented no evidence to support its claim that the transfer price was distorted, while Columbia "presented three Transfer Pricing Studies as evidence that its Intercompany Transactions were conducted at arm's length rates . . . ."  *Id.* at 897–98.

We find the present case is factually distinguishable because, unlike the Department in *Columbia Sportswear*, the Department here presented substantial evidence in the form of expert testimony that TSC's transfer pricing with TSC Texas is not arm's length and results in distortion of TSC's income.  However, the verbiage in *Columbia Sportswear* forbidding an alternate formula that

"recalculate[s] the tax base" does support TSC's argument that CUR is improper. *Id*. at 899.  In this case, CUR effectively recalculates TSC's tax base by substituting the TSC *group's* "sales everywhere" income for TSC's *individual* "sales everywhere" income.  To the extent that the holding in *Columbia Sportswear* contradicts this court's holding in *Media General*, we find our supreme court aligned with states who have found CUR an appropriate alternative formula.  *See, e.g.*, *Leathers*, 935 S.W.2d at 256 (holding that Arkansas's apportionment statute "grants the Commissioner the discretionary power to require or permit the apportionment on a combined basis of the income of a taxpayer that is part of a unitary business"); *Coca Cola Co.*, 533 P.2d at 793–94 (authorizing combined reporting as an appropriate alternative method where the standard formula created distortion); *Pioneer Container Corp. v. Beshears*, 684 P.2d 396 (Kan. 1984), and cases cited therein (discussing whether combined reporting is authorized under UDITPA's apportionment provisions).

TSC also argues the ALC erred in finding CUR is reasonable and equitable, because "the Department did not present evidence of an Arm's Length Standard the procurement charge supposedly failed to meet."  TSC argues that instead of imposing CUR, the Department should have identified an appropriate arm's length standard and adjusted the inventory markup from the 9.7% utilized by TSC to one that does meet the reasonable arm's length standard.

The supreme court addressed and rejected similar arguments in both *Media General* and *CarMax*.  In *Media General*, the Department argued that "other methods, such as changing the factors to be considered in the apportionment ratios, may be used to correct the problems caused by application of the standard apportionment statutes" rather than using combined apportionment.  388 S.C. at 151, 694 S.E.2d at 531.  The court rejected the Department's argument that combined entity apportionment could not be utilized where other methods could correct the distortion and emphasized that the Department "need not automatically use the method requested by a taxpayer, as it has the discretion to select an alternative method that fairly measures the taxpayer's income in South Carolina." *Id.* at 151, 694 S.E.2d at 531–32.  In *CarMax*, the supreme court similarly rejected this court's holding that the proponent of the alternative formula "must establish that its alternative method is not only appropriate, but more appropriate than any competing methods."  411 S.C. at 88, 767 S.E.2d at 199 (quoting *CarMax Auto Superstores W. Coast, Inc*., 397 S.C. at 611, 725 S.E.2d at 714).  Instead, the court held the proponent must only show that the deviation from a "statutory apportionment formula is reasonable," and no further showing is required. *Id.*  We

similarly find that the Department in this case had discretion to choose the alternative apportionment method, so long as the method was reasonable.

In this case, in determining whether the Department's use of CUR was reasonable, the ALC adopted the reasonableness test set forth in South Carolina Revenue Ruling 15-5 (2015), promulgated by the Department as guidance for taxpayers on when the Department would consider an alternate apportionment method. Revenue Ruling 15-5 cites the reasonableness test set forth by the Oregon Supreme Court in *Twentieth Century-Fox Film Corporation v. Department of Revenue*:

> [R]easonableness has at least three components: (1) the division of income fairly represents business activity and if applied uniformly would result in taxation of no more or no less than 100 percent of taxpayer's income; (2) the division of income does not create or foster lack of uniformity among UDITPA jurisdictions; and (3) the division of income reflects the economic reality of the business activity engaged in by the taxpayer.

700 P.2d 1035, 1043 (Or. 1985).

Revenue Ruling 15-5 further states that "any alternative apportionment method should be determined in relation to the reasons the standard statutory method does not fairly represent the business activity in the state." In other words, the alternate formula should cure any defects in the standard apportionment formula.

The ALC found the Department met its burden of showing that CUR was a reasonable method of apportionment in this case. As to factor one, the ALC rejected TSC's argument that using CUR violates the first factor because "well more than 100% of TSC's income would be taxed" if all states assessed TSC's taxes in this manner. As the ALC pointed out, TSC's argument is "relying on the 9.7% [procurement charge] as correct and not distorting TSC's net taxable income in South Carolina. If the 9.7% markup does not distort TSC's net taxable income, then Petitioner's contention that combined unitary reporting overtaxes TSC would be correct. . . . Nevertheless, because [TSC's] argument is based on an unreasonable transfer price, its calculations are likewise unreasonable and unpersuasive." In other words, TSC may have to pay taxes on the income it sought to shelter from taxes using the overly aggressive procurement charge, but it will not be subject to double taxation.

Because South Carolina is not a UDITPA jurisdiction, the ALC found the second factor did not apply. As to the third factor, the ALC found CUR better reflected TSC's business activity within the state because it removed the effects of the inflated transfer price while also recognizing the value flowing from the TSC group and carving out only the income from retail sales associated with South Carolina. The ALC noted that TSC's own witness, Professor Richard Pomp, testified that CUR is a reasonable method, even preferable to separate reporting, for equitably apportioning all of the business of a unitary group. We find substantial evidence in the record to support the ALC's finding that CUR is a reasonable alternative formula. [5]

Finally, TSC argues that allowing CUR as an alternative apportionment method will negatively impact the business community in our state. The legislature, however, specifically allowed for *either* the taxpayer or the Department to seek to employ an alternative apportionment formula. § 12-6-2320(A). In both *Media General* and in *CarMax*, the taxpayer sought to use CUR to its advantage to lessen its tax liability. The *Media General* court characterized the apportionment statute in that case as a "relief mechanism" for the taxpayer. 388 S.C. at 151, 694 S.E.2d at 531; s*ee also* Helms & Christian, *supra* at 11 ("The *Media General* case should be seen as providing some glimmer of hope for taxpayers seeking fair solutions, particularly in separate entity states with UDITPA section 18 language."); William Pierce, *The Uniform Division of Income for State Tax Purposes*, 35 Taxes 747, 781

---

[5] The legislature revised the apportionment statute effective March 11, 2024, giving the Department specific authority to "determine whether the taxpayer's intercompany transactions have economic substance and are at fair market value and for the accurate computation of the taxpayer's state net income properly attributable to its business activity in this State." S.C. Code Ann. § 12-6-2320(B)(1) (Supp. 2025). If the Department determines the transactions are not at fair market value, the Department "may redetermine the state net income of the taxpayer properly attributable to its business activity in this State" by several methods, including "requiring the taxpayer to file a return that reflects the net income on a combined basis of all members of its affiliated group that are conducting a unitary business." § 12-6-2320(B)(2). In the combined return, "the combined state net income of the taxpayer and the members of the affiliated group of entities must be apportioned to this State by use of an apportionment formula that fairly represents the extent of taxpayer's business activity in this State and which fairly reflects the apportionment formula . . . applicable to the taxpayer and each member of the affiliated group included in the combined return." § 12-6-2320(B)(9).

(1957) ("[The apportionment statute] gives *both the tax collection agency and the taxpayer* some latitude for showing that for the particular business activity, some more equitable method of allocation and apportionment could be achieved.") (emphasis added).  Thus, we find CUR in and of itself is neither pro-taxpayer nor pro-Department.

## III.  Is Revenue Ruling 15-5 a violation of the Administrative Procedures Act, and did the ALC err in relying on the ruling?

TSC argues the Department's use of Revenue Ruling 15-5 violates the Administrative Procedures Act (APA) because it implements major policy changes without observing the formalities required to promulgate a valid regulation.  TSC argues the Department was required to promulgate a valid regulation before imposing CUR as an alternative method.  TSC further argues that Revenue Ruling 15-5 was not issued until June 12, 2015, and should therefore not have been applied retroactively against TSC for the tax years 2014 and 2015.

The ALC rejected TSC's argument that the revenue ruling is an improper regulation and found that the ruling did not establish a "binding norm" because the Department is free to exercise its discretion in applying the policy.  The ALC further found that it "simply explains to the public the various factors and legal authority the Department will consider when evaluating, based on the facts of the case, whether an alternative apportion method . . . is appropriate."

We agree that Rev. Ruling 15-5 is not an improper regulation.  The Ruling was published in response to the court's decision in *Media General*.  It recites the court's decision, along with the statute, and offers guidance as to what facts it may rely on to decide whether an alternative formula is appropriate.  More importantly, the Department's use of CUR was authorized by the statute and the court's ruling in *Media General*, not the Revenue Ruling.

Finally, we find persuasive the Department's argument that because TSC chose to file a unitary combined return in South Carolina for the tax year 2012—three years after the *Media General* opinion—TSC cannot now credibly argue that it was unfairly surprised when the Department required CUR in 2014 and 2015.

**CONCLUSION**

In light of our supreme court's holding in *Media General*, we find the argument that CUR is not authorized by the apportionment statute unpersuasive. Furthermore, in this case the Department presented a wealth of testimony showing that TSC's inflated transfer pricing resulted in distortion of TSC's South Carolina business activity under the standard sales factor formula because it allowed TSC to artificially shift income from TSC to TSC Texas. The Department further demonstrated by expert testimony that CUR is both reasonable and equitable, and it cures the distortion created by use of the standard formula. We find substantial evidence in the record to support the ALC's ruling.

**AFFIRMED.**

**WILLIAMS, C.J., and THOMAS, J. concur.**